**Michael Scott FREEMAN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–91–410–CR.**

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1992.

Discretionary Review Refused Jan. 13, 1993.

Houston Munson, Munson, Burns, Munson & Munson, Gonzales, for appellant.

W.C. Kirkendall, Dist. Atty., 25th Judicial District, Dwight E. Peschell, Asst. Dist. Atty., Seguin, for the State.

Before NYE, C.J., and DORSEY and GILBERTO HINOJOSA, JJ.

## OPINION

NYE, Chief Justice.

A jury convicted appellant of murder and assessed punishment at ninety-nine years in prison. By six points of error, appellant claims that insufficient evidence exists to support his conviction, that the trial court erred in discharging a juror, erred in denying his motion for instructed verdict, and erred in denying his motion for new trial. We affirm the trial court's judgment.

The evidence that appellant murdered Alva Lloyd Bell (known as Bobby Bell) was circumstantial. Witnesses testified for the State that they saw appellant and Bell drinking together at a local bar on a Monday night in mid-June. The two drank heavily. Bell paid for the drinks because appellant had little or no money. Two witnesses testified that appellant and Bell argued about money that night. Appellant and Bell left the bar together at closing time—midnight. The next time either of the two men could be accounted for was around 1:30 or 2:00 a.m. Tuesday when appellant checked-in to the Triangle Motel in Hallettsville. The motel owner stated that appellant paid for the room from a wad of cash containing twenty and one-hundred dollar bills. She stated that he easily had several hundred dollars on him. She also saw blood on appellant's t-shirt and arms.

The victim's mother found her son's body on the grounds of her country house out-

side the Nixon–Smiley area on Tuesday morning.

By his first point, appellant claims that the trial court's decision to discharge a juror after the first day's evidence and to continue the trial with only eleven jurors denied appellant the right to a unanimous verdict of twelve jurors. After the first day of trial, one of the jurors telephoned the trial judge at home and expressed misgivings about sitting on the jury. In chambers the next morning with counsel present, the juror, Martinez, explained that he had doubts about his ability to keep a clear mind during the proceedings, and as such, he did not think it would be fair to appellant. He was concerned that he might not "do the right thing." Appellant's attorney moved for a mistrial. The trial court denied the motion, excused the juror for emotional disability, and trial proceeded with eleven jurors.

■ A juror may be discharged, and eleven jurors may render a verdict, if the discharged juror has become disabled. *See Bass v. State*, 622 S.W.2d 101, 105 (Tex. Crim.App.1981), *cert. denied*, 456 U.S. 965, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982); Tex. Code Crim.Proc.Ann. art. 36.29(a) (Vernon Supp.1992). The decision to discharge a juror under article 36.29(a) lies within the trial court's discretion. However, the trial court's power to discharge a juror for a disability is limited to those instances where there exists some physical illness, mental condition, or emotional state which hinders the juror's ability to perform his duties. *Landrum v. State*, 788 S.W.2d 577, 579 (Tex.Crim.App.1990); *Hughes v. State*, 787 S.W.2d 193, 195 (Tex.App.—Corpus Christi 1990, pet. ref'd). A juror may not be discharged because of bias or prejudice against the defendant or against the law applicable to the case. *Landrum*, 788 S.W.2d at 579.

■ The trial court found that the juror was disabled due to an emotional problem. That conclusion is supported by the statement of facts. The record contains no evidence that Juror Martinez held any bias or prejudice towards appellant or to any law applicable to the case. Counsel for both the State and the appellant questioned Martinez, as did the trial judge. The juror

stated that he provided the sole financial support for his family. He was very concerned about being absent from his job and he did not feel that he could be attentive during trial. He realized the importance of his duty as a juror to pay close attention and weigh the evidence carefully. He did not think he would be able to perform that duty. He felt this inability would be unfair to the defendant. The trial court was able to observe Martinez's demeanor and listen to his tone of voice. We find no abuse of discretion in the trial court's ruling. Point one is overruled.

■ By points two and three, appellant argues that insufficient evidence supports the verdict and that the trial court erred in denying his motion for instructed verdict. A challenge to a ruling on a motion for directed verdict is in actuality merely a challenge to the sufficiency of the evidence to support the conviction. *Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 2912, 115 L.Ed.2d 1076 (1991); *Velasquez v. State*, 815 S.W.2d 842, 845 (Tex.App.— Corpus Christi 1991, no pet.); *Zule v. State*, 802 S.W.2d 28, 32 n. 3 (Tex.App.— Corpus Christi 1990, pet. ref'd). Appellant also claims he was entitled to a jury instruction on circumstantial evidence. He argues that, under *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991), the trial court erred in failing to instruct the jury on circumstantial evidence since the court did not instruct on reasonable doubt.

The Court of Criminal Appeals ruled that *Geesa* will have a limited prospective application. Because appellant's trial occurred prior to the Geesa ruling, the trial court did not err in denying the requested instruction on circumstantial evidence. *Butler v. State*, 769 S.W.2d 234, 243 (Tex.Crim.App. 1989); *Hankins v. State*, 646 S.W.2d 191, 197 (Tex.Crim.App.1981). Moreover, although the Court of Criminal Appeals abolished the requirement of a charge on circumstantial evidence, it nevertheless refused to require trial courts to define reasonable doubt. *Butler*, 769 S.W.2d at 243 (Clinton, J. concurring). Pursuant to *Geesa* and *Butler*, we apply the reasonable-

hypothesis-of-innocence analytical construct to determine whether any rational trier of fact could have found every element of the charged offense beyond a reasonable doubt. *Geesa*, 820 S.W.2d at 165; *Madden*, 799 S.W.2d at 686; *Velasquez*, 815 S.W.2d at 845.

The State's indictment alleged that appellant "intentionally caused the death of ... Alva Lloyd Bell, Jr., by beating him with an object unknown to the grand jury...." Appellant argues that insufficient evidence exists to uphold his conviction since the State produced no murder weapon, no fingerprints, foot prints or tire tracks, no blood stains matching the victim's blood type on the appellant's clothes, no personal property of the appellant at the murder scene, and none of Bell's personal property in appellant's possession.

Bobby Bell worked with appellant in the oil fields. He lived in Nixon, Texas with his mother. Ms. Bell owns a country house on the old Nixon–Smiley Road. She found his body at the country house around 8:00 a.m. Tuesday. He was already cold and stiff. Based upon the body's stiffness, the medical examiner estimated that Bell died within the twenty-four hours before 1:00 p.m. Tuesday, June 19th. The examiner testified that the development of rigor mortis in a body is ordinarily complete within six to twelve hours after death. From this evidence, the State argued that the murder occurred between 12:00 a.m. and 2:00 a.m. on Tuesday. Bell died from head wounds which were inflicted with such force that his skull was fractured and his brain lacerated. The examiner found circular wounds and bruises on the skull measuring 2.6–2.7 centimeters in diameter. The size and shape of these wounds convinced him that a hammer was used to bludgeon Bell to death.

Donald Brzozowski, the Gonzales County Sheriff, arrived at the Bell country house around 9:00 a.m. Tuesday morning. He testified that he found a billfold bearing the victim's driver's license [1] near the body. The billfold contained no money. The sheriff also found blood splatters on the door

and shutters of the country house. He never found a murder weapon.

The State's evidence showed that Bell and appellant spent most of Bell's last weekend together. Ms. Bell last spoke to her son on Saturday evening. Bobby and appellant were staying with a co-worker in Victoria. Bell telephoned his mother from Victoria to ask if she could give him a ride back to the Nixon–Smiley area. He informed her minutes later that he would catch a ride with someone else.

Lee Girndt was the man who hosted Bell and appellant at his house in Victoria on Saturday night. Brzozowski learned from Girndt that appellant had been a guest with Bell, and that appellant lived in Hallettsville. Brzozowski traveled to Hallettsville and spoke with appellant. Appellant told Brzozowski that he drove the victim back to Smiley on Sunday morning. Some time after they arrived, they went to Rudy & Amelia's Restaurant & Bar where they had some drinks. Appellant told Brzozowski that he last saw Bell around noon on Monday when Bell was "bumping" dice in the back of appellant's truck with three young Hispanic men. Appellant stated that he then went back to Hallettsville.

Hap's Handy Shop is a convenience store in Smiley. The sales clerk there testified that Bell made a purchase on Monday morning. Mike Miller was at Hap's that morning. He saw Bell sitting on the passenger side of appellant's pickup truck. Mary Beth Elder, a teller for the Bank of Smiley, cashed a $600 check for Bell between 2:00 and 2:30 p.m. Monday afternoon.

Jessica Garcia and Gaylyn Canada, employees at Rudy & Amelia's Bar, testified that appellant and Bell were drinking together at the bar on both Sunday and Monday. Garcia stated that on Monday, Bell purchased beers for appellant and himself. He paid for the drinks from a wad of twenties in his pocket. She also saw that he had a stack of large bills in his wallet. Canada, who was not working Monday night, but who spent time in the bar with

---

**1.** The record shows that the item in evidence is actually a Department of Public Safety identification card. Witnesses testified that Bell did not have a driver's license.

Bell and appellant, stated that Bell had $800 cash. Rudy Vasquez, owner of Rudy & Amelia's, testified that on Sunday he cashed a $115 check for Bell. Bell also had a larger check that Vasquez did not cash for him.

The witnesses overheard appellant and the victim arguing about money Monday evening. The two men left Rudy & Amelia's together at closing time on Monday. Bell was so drunk that he had to have help getting to appellant's pickup. One to two hours later, appellant arrived at the motel in Hallettsville. He paid for his room from a wad of money, easily several hundred dollars. Mrs. Neilson, the motel owner, testified that appellant acted very nervous and fidgety. He was hyper, and he mumbled. She also noticed what she knew to be blood splashed on his t-shirt and his arms.

Almost five weeks after Bell's body was found, Brzozowski arrested appellant in Fresno, Texas.

Appellant's testimony closely mirrored the State's facts. He and Bell were at Rudy & Amelia's both Sunday and Monday night. However, appellant claims they left and went back to the country house well before dark. The three Hispanic males they saw at Hap's drove up to the country house and Bell began to play dice with them. When appellant noticed Bell palming another set of dice, he decided to leave. He could not pin-point a time, only that he left before dark. Appellant stated that he then drove to Hallettsville, where he met a woman at the Charter Store. They spent the night together at the Triangle Motel.

Defense witnesses testified that they saw appellant at the Charter Store and the Office Club in Hallettsville on Monday evening. Samantha Quibodeau admitted that she had been with appellant at the Triangle Motel, but she was uncertain of the date. She estimated that it was either May or June, two weeks before she moved into a new apartment.

The evidence concerning appellant's attire the night of the murder was conflicting. Garcia stated that when appellant was at Rudy & Amelia's on Sunday he wore a pair of loud jams and a t-shirt. Monday he wore blue jeans and a cowboy shirt. Canada was certain that appellant wore the jeans and cowboy shirt on Sunday, the jams and t-shirt on Monday. Both women identified a photograph of a pair of jams that the sheriff took from appellant as being the ones appellant wore or similar to the jams he wore. Appellant admitted that the jams were his—the only pair he owned. He testified that he wore the jams and t-shirt Sunday night and blue jeans with the cowboy shirt on Monday. Neilson testified that appellant checked into her motel wearing jams and a blood-stained t-shirt, light in color, with writing on it. However, she stated that the jams in the photograph were definitely not the ones appellant wore.

The State introduced photographs of three different t-shirts belonging to appellant. None of the witnesses positively identified any of the t-shirts as being the one appellant wore. Defense witnesses testified that when they saw appellant in Hallettsville on Monday, he wore blue jeans and a cowboy or dress shirt. A body fluids expert, Donna Stanley, tested the jams and one of the t-shirts, a dirty tan one, for traces of blood. The tests were positive, but the blood type found on the jams (type B) did not match Bobby Bell's (type O). In her opinion, most of the substances that showed positive on the t-shirt were not human blood. She also testified that oil, dirt, and other substances can cause a false positive. She stated that washing the clothing can also remove traces of blood.

Although testimony varied regarding appellant's attire and whereabouts during the crucial time periods, inconsistencies in the evidence are reconciled in favor of the jury's verdict. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex.Crim.App.1982); Tex. Code Crim.Proc.Ann. art. 36.13 (Vernon 1981), and 38.04 (Vernon 1979). The evidence, when viewed in the light most favorable to the verdict, shows that the victim spent the last day of his life with appellant. They drank heavily. The victim had a large amount of cash on him and appellant had little or none. They fought over money. The victim left a bar at midnight with appellant. Approximately two hours later, appellant checked into a motel situated ap-

proximately an hour and one-half's drive from the murder scene. He had a large wad of cash and blood on his arms and clothing. He acted nervous, fidgety, and hyper. The victim's body was found, cold and stiff, six to eight hours later, his empty wallet lying near him. Appellant placed himself at the murder scene that night. Furthermore, answers appellant initially gave to the sheriff conflicted with his trial testimony. The inconsistencies were particularly crucial as they involved the timing of events the day of the murder. The State provided evidence of the corpus delicti of murder and of a motive. A rational trier of fact could have found all of the essential elements of the crime. We overrule points two and three.

By point four, appellant claims that the trial court erred in denying his motion for new trial because the jury received other evidence after retiring to deliberate. Sheriff Brzozowski testified that he drove the route from the Bell country house to the Triangle Motel in Hallettsville in an hour and ten minutes.[2] Thus, appellant could easily be placed leaving Rudy & Amelia's with Bell at midnight and arriving at the Triangle Motel between 1:30 a.m. and 2:00 a.m. At appellant's hearing on motion for new trial, one of the jurors, Barta, testified that during deliberations he and "two or three" other jurors stated that they knew the area and could drive the route in the time the Sheriff stated. The record does not indicate how extensive the discussion was. The time verification came from Barta's own knowledge and personal experience. Neither Barta nor any of the other jurors actually tested the driving time. Barta stated that he gauged his knowledge against the witness's testimony to determine if the witness spoke truthfully.

■■■ In order to mandate a new trial on grounds that the jury received other evidence during deliberations, the appellant must satisfy a two-pronged test: (1) the other evidence must be received by the jury, and (2) it must be detrimental to the defendant. *Romo v. State*, 631 S.W.2d 504, 506 (Tex.Crim.App.1982); *Stephenson*

*v. State*, 571 S.W.2d 174, 176 (Tex.Crim. App.1978); *Baldonado v. State*, 745 S.W.2d 491, 495 (Tex.App.—Corpus Christi 1988, pet. ref'd). The question of whether the jury has received other evidence is an issue for the trial court. The determination will not be overturned absent an abuse of discretion.

■■■ We addressed the same issue in *Zuniga v. State*, 635 S.W.2d 780 (Tex.App.— Corpus Christi 1982, pet. ref'd). In *Zuniga*, one juror stated during deliberations that, due to her son's drug abuse, she knew the physical signs of drug use and that one of the witnesses appeared to be "higher than a kite" on the witness stand. This Court stated:

> [i]n determining what is proper and what is improper discussion among jurors, regard must be had for the fact that the jury are supposedly men of different walks of life, avocations, and necessarily views that would be affected by their past experiences and situations. They could hardly arrive at a solution of their differences without discussion of the facts before them, and each man's discussion would necessarily be tinged or affected by his own viewpoint and experiences (citations omitted).

*Zuniga*, 635 S.W.2d at 781–82; *Rodriguez v. State*, 661 S.W.2d 332, 336 (Tex.App.— Corpus Christi 1983, pet. ref'd); *see also Bartell v. State*, 464 S.W.2d 863, 865 (Tex. Crim.App.1971) (the law contemplates that the jurors will consider their past experiences). The evidence of the driving time was uncontested. Appellant admits that Brzozowski's testimony is the only evidence in the record of driving time between the murder scene and the motel. Juror Barta indicated that his and the others' statements were simply that they knew the route and could drive it in the specified time. The evidence of the driving time between Nixon–Smiley and Hallettsville was uncontested and was already before the jury when they began their deliberations. The trial court did not abuse its discretion in determining that the jury re-

2. The sheriff admitted that the driving time could have been as much as an hour and a half, owing to the fact that he drives faster than most people.

ceived no other evidence harmful to appellant. Point four is overruled.

By point five, appellant claims the trial court erred in denying his motion for new trial when he showed that a juror discussed the trial with a third person. Juror Tieken stated that during the course of trial, she saw the sheriff at a social function. In the course of a conversation the two had, the sheriff stated, "This is a heck of a case and he (defense counsel) is probably going to drag it out." Appellant avers that the sheriff's comment was prejudicial to him because the sheriff was a principal prosecution witness and the comment indicated a defensive maneuver. At voir dire, the panel was told that trial could possibly take a week. Tieken told the sheriff about some plans she made and asked him if he thought trial would be finished within the estimated time.

■■■■ The rule against jurors conversing with unauthorized persons is so strong that injury is presumed. However, the presumption is rebuttable. The juror stated that she and the sheriff did not discuss the facts of the case. Moreover, she said that nothing about the comment affected her verdict in any way. Before a new trial is warranted, there must be injury to the accused. *Moody v. State*, 827 S.W.2d 875, 898–900 (Tex.Crim.App.1992); *McMahon v. State*, 582 S.W.2d 786, 793 (Tex.Crim.App. 1978), *cert. denied*, 444 U.S. 919, 100 S.Ct. 238, 62 L.Ed.2d 175 (1979). We overrule point five because the comment resulted in no harm to the appellant.

By point six, appellant claims that he discovered new, favorable evidence after the verdict, and the trial court erred in failing to grant him a new trial on those grounds. Appellant states he obtained new evidence in three crucial areas: (1) the shirt worn by appellant the night of the murder, (2) the existence of blood splatters on the shirt and on appellant's arms, and (3) when appellant was at the motel with Samantha Quibodeau.

■■■■ The trial court may, in its discretion, grant a new trial based on newly discovered evidence. New trials based on newly discovered evidence are not favored, *Drew v. State*, 743 S.W.2d 207, 225 (Tex.

Crim.App.1987), and denial of the request will not be overturned on appeal absent a showing that the trial court abused its discretion. To establish an abuse of discretion, the defendant must show: (1) that the evidence was unknown to him before trial, (2) that his failure to discover it was not due to his want of diligence, (3) that it is probably true and its materiality is such as will probably bring about a different result upon a new trial, and (4) that it is competent, not merely cumulative, corroborative, collateral, or impeaching. *Drew*, 743 S.W.2d at 226; *Sawyer v. State*, 778 S.W.2d 541, 545 (Tex.App.—Corpus Christi 1989, pet. ref'd); *Sweeten v. State*, 686 S.W.2d 680, 683 (Tex.App.—Corpus Christi 1985, no pet.). Appellant claims that he was unable to adequately assist his attorney in discovery before trial. He was incarcerated in Brazoria County and his attorney was in Gonzales County. Therefore, he argues that the lack of this evidence was not due to a want of diligence on his part.

The Shirt:

■■■■ Trial witnesses disagreed on appellant's attire the night of the murder. Gaylyn Canada testified that appellant had on a cowboy shirt and blue jeans on Monday night. Jessica Garcia stated unequivocally that he wore loud jams and a t-shirt. Judy Neilson swore that appellant wore jams and a light colored t-shirt with writing on it when he came to her motel. She saw blood on the t-shirt. Appellant testified that he wore jeans and a striped shirt on Monday. Three defense witnesses stated that when they saw appellant in Hallettsville on Monday, he wore blue jeans and a striped shirt. On motion for new trial, Lee Girndt revealed that he gave appellant the striped shirt when the three men stayed together at Girndt's house on Saturday. Tim Sheridan, testifying for the first time, claimed that he saw appellant at a relative's house on Monday evening. He testified that Appellant wore the striped shirt and it had no blood on it.

Appellant does not show that the absence of Girndt's and Sheridan's evidence was not due to a lack of diligence on his part.

Girndt testified for the State at trial. No evidence in the record shows that Sheridan or the relative, Gary Tesche, were unavailable at the time of trial. At trial, appellant brought three witnesses who testified that they saw appellant in Hallettsville on June 18th, the day after Father's Day, the night of the murder. They stated he wore blue jeans and a loud striped "dress" or "cowboy" shirt. The jury had the benefit of this evidence as they deliberated. They chose to disbelieve these witnesses, or at least to believe that they had seen appellant on a day other than the eve of the murder. Appellant has not shown that the new evidence was unavailable or that the trial's outcome would probably have been different.

Blood on the t-shirt:

Appellant claims that Judy Neilson, owner of the Triangle Motel, recanted her trial testimony that she saw blood on appellant's t-shirt and arms. The hearing on motion for new trial shows that Neilson did not recant. She reiterated that when she saw appellant that night, she thought that he had been in a fight and that he was dusty and dirty. When asked at the hearing if the substance she had seen on appellant's shirt that night might have been dust, dirt, or mud, she said that it was possible, meaning that dust, dirt, or mud could have been on appellant's clothing *in addition to* the blood. Neilson stated at trial that she originally thought the red spots on appellant's arms and clothing were paint. The claim that the substance on the shirt was something other than blood was suggested by Neilson's testimony and could have been developed at trial.

Affair at the Motel:

Finally, appellant claims that additional evidence of appellant's affair with Samantha Quibodeau came to light after trial. At trial, Samantha Quibodeau placed the date of her affair with appellant at two weeks before she rented a new apartment, but she was uncertain of that date. She repeatedly stated that the affair occurred in May. She also insisted that it was some two weeks before she moved. Upon strenuous cross-examination, Quibodeau agreed that she and appellant's counsel had verified that her new lease began July 1, thus dating the affair in mid-June. On the motion for new trial, Quibodeau's apartment manager testified that Quibodeau leased a new apartment on July 1. Appellant complains that Quibodeau's apartment manager was out of town during trial, and therefore evidence of the lease date was unavailable. Although the manager of the apartments was on vacation at the time of trial, she stated that she stayed home during her vacation and she could have been contacted "very easily." This evidence was available to appellant before or at the time of trial. The trial court did not abuse its discretion in denying appellant's motion for new trial.

In addition, appellant claims that new evidence came to light when Samantha Quibodeau revealed that appellant changed clothes between being picked up at the Charter Store in Hallettsville and checking into the Triangle Motel. Quibodeau testified that she and appellant drove out on an dusty gravel road, drank beer, and parked. Appellant changed from "good clothes" to a clean pair of flowered jams and a plain white t-shirt. He took the t-shirt from behind the truck's seat, and the truck was dusty. Appellant claims this testimony constituted new evidence and that the district attorney withheld this evidence.

The credibility of witnesses and the probable truth of new evidence are matters for the trial court's discretion. *Turner v. State,* 721 S.W.2d 909, 911 (Tex.App.— Houston [1st Dist.] 1986, pet. ref'd, untimely filed). Appellant himself testified unequivocally that he wore blue jeans and a dress shirt on Monday night, that he checked into the Triangle Motel in those clothes, and that he even wore them the next day. He stated that Neilson was either lying or mistaken in her testimony that she saw him in jams and a t-shirt at her motel. Quibodeau claimed that she told the district attorney and appellant's attorney that appellant changed his clothes. The trial court did not err in denying appellant's motion for new trial in that he failed to show that the evidence is probably true and its materiality is such as will probably bring about a different result upon a new trial. Moreover, the evidence was available to appellant's attorney before trial, and it

merely impeaches testimony of State and defense witnesses. *Drew,* 743 S.W.2d at 226; *Sawyer,* 778 S.W.2d at 545. We overrule point six.

The trial court's judgment is AFFIRMED.