**Mervin EDWARDS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 06–96–00044–CR.**

Court of Appeals of Texas, Texarkana.

Submitted June 23, 1998.

Decided Sept. 15, 1998.

**360**

Before CORNELIUS, C.J., and GRANT and ROSS, JJ.

## OPINION

GRANT, Justice.

Mervin Edwards appeals his capital murder conviction. The trial court assessed his punishment at life imprisonment after the jury found sufficient mitigating circumstances preventing the imposition of the death penalty as requested by the State.

Edwards contends (1) that there was insufficient evidence of intent to support his conviction; (2) that the State suppressed discoverable evidence until the time of trial, thereby depriving him of a fair trial and his due process rights; (3) that the State violated his equal protection rights when it exercised its peremptory strikes; and (4) that the trial court erred in dismissing a certain potential juror.

On the night of September 18, 1995, James Carroll and his wife, Charlotte, exited a bowling alley and walked toward their car in the parking lot. When they reached the vehicle, three men, including Edwards, approached the couple and demanded money at gunpoint. Charlotte shoved her purse into the chest of her assailant and ran. While she was running away, she heard one gunshot. She did not see what transpired between the men and her husband. At trial, Edwards testified that as James charged at him, Edwards shot James once in the chest with a shotgun. James died as a result of his wounds.

█ In his first point of error, Edwards contends that there was insufficient evidence to support the jury's finding that he shot James with the intention of killing him. Instead, Edwards contends that the evidence shows that he accidentally shot James while they scuffled.

Although Edwards does not expressly state whether he is asserting legal or factual sufficiency, his argument is couched solely as a factual sufficiency argument, in that he cites only the standards required in reviewing a factual sufficiency point. We will only

Scott Rectenwald, Attorney At Law, Marshall, for appellant.

Todd E. Fitts, Asst. District Attorney, Marshall, for appellee.

address the factual sufficiency of the evidence to support the jury's verdict.

When reviewing a factual sufficiency point, the appellate court views all the evidence and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.[1] The jury is the exclusive judge of the facts proved, the credibility of the witnesses, and the weight to be given their testimony.[2] The appellate court does not re-evaluate the weight and credibility of the evidence, but acts only to ensure that the jury reached a rational decision.[3]

In this case, it is undisputed that Edwards fired the fatal shot with a shotgun during a robbery. The question is whether, based on all the facts presented, the jury erred in finding that Edwards formed the requisite intent to kill.

Edwards asserts that most of the expert evidence, and all of the direct evidence, shows that he shot James at close range. Edwards argues that the close range of the shot demonstrates that the gun firing was accidental. The direct evidence to which Edwards refers is his own testimony wherein he testified that he shot the victim accidentally when the two struggled.

The expert evidence was sharply divided. Doctor Booker, Edwards's expert witness, testified that the fatal shot was fired between twelve and thirty inches away from James's chest. The State presented two expert witnesses, Dr. Robert Palmer, who conducted the autopsy, and Glenn Johnson, the laboratory supervisor for the Texas Department of Public Safety crime laboratory. Although Palmer initially stated several times during the autopsy video that James suffered a close contact wound, he later testified in court that, after reviewing the measurements and edges of the wound and after consulting books and other information on forensic pathology, the victim's injury was consistent with a gun fired at a range of four to six feet.

The State's other expert, Johnson, examined James's clothes to determine the distance of the shirt from the shotgun when the shirt was pierced. Johnson testified that the shot was fired between three and ten feet away from the shirt.

The jury was free to believe whichever expert it found to be most credible.

Julie Ruffin, a friend of Edwards, who spoke with Edwards about the shooting soon after the event, also testified. At one point, Ruffin stated that Edwards told her that when "they were robbing this couple at a bowling alley and the guy had struck at him, or was trying to fight him or whatever, and that the gun went off and he shot him." However, later, there is a dispute as to whether Edwards told her that the gun went off or that he shot him. She also testified that Edwards told her that "he shot the man if you want it word for word." He did not tell her that it was an accident, a mistake, or that James grabbed the gun barrel, causing it to fire.

The State contends that, while there is evidence showing that the victim and Edwards got into a scuffle sometime before Edwards fired the gun, the jury was free to disbelieve Edwards's theory that a scuffle was taking place when the gun discharged.

Edwards submitted a voluntary statement to Hall Reavis, an investigator with the district attorney's office. The tape recording of their conversation was presented to the jury, which included the following exchange:

> Edwards: ... So, we got out of the car and we walked over there. The guy had his back turned to me and I said, "Say man, don't move[,]" and he turned around and I knew he had to be intoxicated because he was kind of stunned at first and he charged me and we got to tussling and that's when he knocked the hat off my head and——
>
> Reavis: And what kind of hat did you have on your head?

1. *Jones v. State*, 944 S.W.2d 642 (Tex.Crim.App. 1996); *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim.App.1996).

2. *Wyatt v. State*, 889 S.W.2d 691, 693 (Tex.App.- Beaumont 1994, no pet.).

3. *Jones*, 944 S.W.2d 642; *Clewis*, 922 S.W.2d 126.

Edwards: Uh—— a Toronto Maple Leaf, blue with white writing on it. So— uh— Tony comes over and he starts punching him until I said, "Get up off him, get up off him." And the dude left me alone for a minute and he starts after Tony and they got to tussling and they fell down and rolled on the ground and he got up and then Dean starts throwing dirt in the guy's eyes and Tony came back over there by me, by the car, and says, are you all right and I said yeah. And the dude said, "Get away from her, get away from her."

Reavis: Okay, and where is she at, at this time?

Edwards: She is still sitting in the car. She's still sitting just screaming, "Please, please, please Lord, please Lord, leave us alone." So the guy comes back over there and— uh— we got to tussling again, because he saw that I was holding the gun and he got to where— and as I shook him off of me and I backed up and like I said, by that time we were about maybe ten, twelve feet away from the car. Tony is towards the car. Dean is just hanging somewhere in the background and— uh— *he charged me again and that's when I fired the shot* and everybody ran to the car and we just left.

(Emphasis added.)

Based on Edwards's own statement, the jury could have reached the rational conclusion that James was running towards Edwards when Edwards fired the gun, not that the gun accidentally discharged while the two men were scuffling. Thus, the jury could have rationally concluded that Edwards formed the requisite intent to kill the victim.

The Texas Court of Criminal Appeals has repeatedly found that "[t]he specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is

reasonably apparent that death or serious bodily injury could not result."[4] In the present case, the victim's wife testified that Edwards waved the shotgun back and forth, pointing it at either her or James. Arguably, the jury could have rationally concluded that it was reasonably apparent that death or serious bodily injury could have, and did, result from Edwards's actions with the gun.

Because the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust, there is factually sufficient evidence to establish that Edwards had the intent to kill. Thus, this point is overruled.

In his second point of error, Edwards contends that the trial court erred in overruling his motions for mistrial and new trial because the State violated his due process rights and denied him an opportunity to receive a fair trial by failing to produce discoverable and material evidence until after the trial had already begun. This evidence consisted of a videotape of the crime scene, a videotape of the autopsy, the handwritten notes of one of the State's experts and three audiotape recordings of witness statements.

■■■ The decision to grant a new trial is at the sound discretion of the trial court and should be overturned on appeal only by showing a clear abuse of discretion.[5] The prosecution's suppression of evidence favorable to the defendant denies the defendant his due process rights under the United States and Texas Constitutions and presents reversible error when (1) there is suppression of evidence by the prosecution, (2) the evidence is favorable to the defendant, and (3) the evidence is material.[6] With regard to the materiality[7] of the evidence, the mere possibility that an item of undisclosed information might have helped the defense or might have affected the outcome of the trial

4. *Godsey v. State,* 719 S.W.2d 578, 580–81 (Tex. Crim.App.1986); *see also Staley v. State,* 887 S.W.2d 885, 889 (Tex.Crim.App.1994).

5. *Baker v. State,* 887 S.W.2d 227, 228 (Tex.App.-Texarkana 1994, no pet.).

6. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Butler v. State,* 736 S.W.2d 668, 670 (Tex.Crim.App.1987).

7. At one time, those who were learned in the law recognized the distinction between the word *material* and the word *relevant.* Alas, this distinction seems to have faded into oblivion. *Relevant* meant tending to prove or disprove a matter in issue. *Material* meant having some logical connection with facts of consequence. BRYAN A. GARNER, A DICTIONARY OF MODERN USAGE 354 (1987).

does not establish materiality in the constitutional sense: the omitted evidence must have been such as would create a reasonable doubt about the defendant's guilt.[8] Also, since all of these items were not disclosed until trial, we must assess whether there is a reasonable probability that the timing of the disclosure adversely affected the defendant's preparation or presentation of the case.[9]

The record indicates that there was not a total suppression in the case in which the State failed to furnish the tapes and notes in dispute, but these tapes and notes were not provided within the trial court's deadline. So, the issue in this case is not that of a suppression, but rather a question of the State's failure to timely provide the tapes and notes. The failure to provide the tapes within the deadline is not automatically a suppression under *Brady*.[10]

We shall examine the disclosure of the evidence to determine if the prosecution's late disclosure amounted to an actual suppression of the evidence by so affecting the defense that it was tantamount to not receiving the evidence in time to give the defense an opportunity to utilize it.

■ We shall discuss first the videotape of the victim's autopsy. Edwards contends that this, along with the other items, would have been beneficial to him by supporting his accidental shooting theory and by helping him impeach certain State witnesses. Dr. Jim Palmer stated several times on the autopsy video that the victim suffered a contact wound, which conflicted with both his later testimony at trial, when he testified that the range of the shot was three to ten feet, and the testimony of Johnson, the State's forensic expert. Impeachment testimony is considered a proper basis for the application of the *Brady* rule.[11]

The existence of the autopsy videotape was not brought to the attention of the defense until the cross-examination of one of the

defense witnesses. This was after Dr. Palmer had testified. The defense was then furnished the videotape, and it was shown to the jury. This in itself was a method of impeaching Dr. Palmer's testimony. The defense did not ask to recall Dr. Palmer to the stand for further cross-examination. As a matter of strategy, the use of prior inconsistent statements may alone be better impeachment than by giving the witness an opportunity to give further explanations of why the earlier statements were inconsistent. While this Court does not condone the State's failure to turn over this evidence prior to trial, we believe that the trial court has some discretion in allowing this evidence to be turned over at a later point. The defendant was not deprived of his opportunity to impeach this witness because he was given the opportunity to present this videotape to the jury.

■ Turning next to the failure of the State to disclose the crime scene videotape, the record showed that this videotape contained statements by Captain Keith Fletcher to the effect that the shooting occurred at point-blank range and that a scuffle took place at the scene. Edwards contends that this evidence supported his accidental shooting theory. This videotape was not presented to the defense until the third day of trial and after nine of the State's twelve witnesses had already testified. Again, this videotape was introduced into evidence and played for the jury. The defense did have an opportunity to question Fletcher about his statements on the tape. Fletcher testified that his statements were not based on personal observation of the shooting itself, but were based upon his conclusions and on what he was told by others.

The fact that a scuffle took place was not disputed in the case. Edwards himself testified that two scuffles occurred, one between himself and the victim and one between a codefendant and the victim. The State's the-

---

8.  *Butler*, 736 S.W.2d at 671.

9.  *O'Rarden v. State*, 777 S.W.2d 455 (Tex.App.-Dallas 1989, pet. ref'd).

10.  See *Harwood v. State*, 961 S.W.2d 531, 544 (Tex.App.-San Antonio 1997, no pet.); *State v. Morrill*, 42 Conn.App. 669, 681 A.2d 369, 374 (Conn.App.1996); *Kansas v. Wacker*, 253 Kan. 664, 861 P.2d 1272, 1280 (Kan.1993).

11.  *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481, 490 (1985); *O'Rarden v. State*, 777 S.W.2d at 458.

ory of the case was not based upon no scuffling occurring, but was based upon the shooting occurring after the scuffling took place. The defendant was not denied an opportunity to present this tape, including Fletcher's comments on the tape to the jury.

■ Next, we examine Edwards's contention that the State failed to disclose its expert's (Johnson) ballistic notes, which contained documents that tended to contradict Johnson's later testimony, and that such failure was prejudicial to the defendant. Johnson testified that he prepared his reports from his memory and experience alone, without the aid of charts or reference books. The notes reveal that his work had been reviewed by John L. Bean, a potential witness, who had not been disclosed. Edwards contends that he was deprived of the opportunity to examine this potential witness because these notes were discovered only after the defense's cross-examination had begun. The defendant also contends that this discovery was made after the cross-examination of Dr. Palmer. Edwards contends that without the information from Johnson's notes about gun powder particles on the deceased's shirt after the shooting, Edwards was deprived of questioning Dr. Palmer about these gun powder particles. The record indicates Dr. Palmer was questioned about the gun powder "specks" on the shirt.

The defense did not ask to recall Dr. Palmer for further examination based upon any new information contained in Johnson's notes. The court offered to recess in order to give the defense the opportunity to contact John L. Bean and make any other discovery investigation that may have been necessitated by the unproduced notes. The defense chose to continue with the trial, thus waiving any error that had been cured by the offer of recessing the trial.

The next items of material that were not produced were three audio tapes.

The defendant had presented no argument, no detail about what these tapes contain, and nothing that would assist this Court in addressing the matters contained on these three audio tapes and how they would have affected this trial. Without argument presented to this Court, this contention is waived.[12]

■ The overall gist of Edwards's contention concerning the tapes and notes is that the lateness of their production deprived him of the opportunity to develop his defense theory more fully. We have concluded, however, that even though the tapes and notes were revealed late, they did not deprive Edwards of his opportunity to present his defense theory, nor was he deprived of a fair trial. Thus, we conclude that this evidence was not suppressed in the sense that the defendant was allowed to utilize it during the course of the trial, and even if it were construed to be suppressed, its being withheld prior to trial did not result in harm to Edwards.

The second point of error is overruled.

In his third point of error, Edwards asserts that the trial court erred in overruling his *Batson*[13] motion after the State used its peremptory strikes to eliminate two thirds of the African–American venire members who could have been selected. Although the State based its strikes on the members' answers on their juror questionnaires, Edwards contends that the State's explanations were pretextual.

Conversely, the State contends that it exercised its peremptory challenges in a racially neutral manner.

■ The question for this Court is whether a discriminatory intent is inherent in the State's explanation.[14] If the State's explanation is not inherently discriminatory, the burden shifts to the defendant to persuade the court that the reason is merely a pretext for discrimination.[15] In determining

**12.** *See* Tex.R.App. P. 38.1(h); *Tidrow v. State,* 916 S.W.2d 623, 631 (Tex.App.-Fort Worth, no pet.).

**13.** *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

**14.** *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Tate v. State,* 939 S.W.2d 738, 743 (Tex.App.-Houston [14th Dist.] 1997, pet. ref'd).

**15.** *Id.*

whether the defendant has met this burden, the trial court must assess the credibility of the State and the persuasiveness of its justification.[16] Findings by the trial court on this issue must be clearly erroneous for the reviewing court to overturn them on appeal.[17] Once the reviewing court reviews the entire record, if there is support for the trial court's decision, then that decision is not clearly erroneous.[18]

■ Edwards contends that the State erred by striking two members of the venire, Franklin Clark and Auguster Singleton, on the basis that they *could not* sit in judgment of another or consider the death penalty, when they also stated during voir dire that they *could* sit in judgment of another. Edwards contends that the State's pretextual explanations were most likely the result of a cursory glance at the questionnaires, not the result of a real investigation. In response, the State contends that it used one peremptory strike on Clark because he was currently on probation for driving while intoxicated, a misdemeanor conviction, which may be a legitimate basis for use of a peremptory strike.[19] Further, when reviewing Clark's entire examination during voir dire, his responses were confusing and conflicting, which is also a permissible use of a peremptory challenge.[20] This same rule applies to Singleton's conflicting testimony. The State gave as its reason for striking venire person Vickey George that she had written bad checks and was the sister of a convicted burglar. Edwards points out that her questionnaire stated that she was in favor of the death penalty and that convicted persons in Harrison County were not given harsh enough sentences for their crimes. In George's case, people who have close associates that have been involved in the criminal justice system may be the subject of a peremptory challenge.[21]

The State contends that, during the *Batson* hearing, Edwards did not rebut the State's neutral explanations; therefore, he has failed to show that the trial court's ruling was clearly erroneous. During that hearing, although Edwards suggested to the trial court that only African–American jurors were questioned about criminal backgrounds, the prosecutor stated that the State ran criminal histories on all potential jurors and then questioned the jurors who had arrests or convictions. Because Edwards did not question the prosecutor or offer further evidence of disparate treatment after the State presented its race-neutral explanations, Edwards did not meet his burden to show that the State's explanations demonstrated a discriminatory scheme; therefore, this point of error is overruled.

■ In his last point of error, Edwards contends that the trial court erred in dismissing Linda Sue Scott as a juror because she was unable to find child care for her fourteen-year-old son, which is not a "disability" recognized by the Texas Code of Criminal Procedure or Texas jurisprudence.

Over the objection of the defense, Scott was excused as a juror because she could not be a fair juror. Edwards asserts that the only evidence of her inability to be fair was that she testified that she would be unable to deliberate and give her attention to the testimony if she did not have a place to keep her son. However, Edwards contends that a reading of the entire exchange between Scott and the court shows that her motive was primarily economic. Because she was excused, the number of African–American jurors was reduced to one.

In response, the State contends that Scott was properly released as a "disabled" juror under Article 36.29(b) of the Texas Code of

16. Id.

17. *Whitsey v. State,* 796 S.W.2d 707, 726 (Tex. Crim.App.1989).

18. *Vargas v. State,* 838 S.W.2d 552, 554 (Tex. Crim.App.1992); *Parra v. State,* 935 S.W.2d 862, 867 (Tex.App.-Texarkana 1996, no pet.); *Whitsey,* 796 S.W.2d at 716.

19. *Keeton v. State,* 749 S.W.2d 861, 870 (Tex. Crim.App.1988).

20. *Wheatfall v. State,* 882 S.W.2d 829 (Tex.Crim. App.1994).

21. *Chambers v. State,* 866 S.W.2d 9, 25 (Tex. Crim.App.1993).

Criminal Procedure.[22] That statute provides that "a juror who dies or becomes disabled from sitting during trial may be replaced by an alternate." The question then becomes what constitutes the meaning of "disabled." The Texas Court of Criminal Appeals has defined "disabled" to mean any condition that inhibits the juror from fully and fairly performing the functions of a juror.[23] In this case, the jury panel members were selected on April 22, and testimony was to begin on May 1. Before May 1, Scott told the court about her difficulty in finding a babysitter for her son. The trial court instructed Scott to continue her efforts to find one. On May 1, when the court held a hearing on her ability to serve as a juror, she stated that her attempts to find a babysitter had failed. The judge stated on the record that she had "worked very hard" to keep Scott on the jury but believed Scott "could not be a fair juror," nor could she "impartially deliberate upon the evidence." We find that the court did not abuse its discretion in concluding that Scott could not perform her duties as a juror. The point of error is overruled.

The judgment of the trial court is affirmed.

**22.** Tex.Code Crim. Proc. Ann. art. 36.29(b) (Vernon Supp.1998).

**23.** *Ramos v. State,* 934 S.W.2d 358 (Tex.Crim. App.1996); *Griffin v. State,* 486 S.W.2d 948, 951 (Tex.Crim.App.1972).