

# NUMBERS 13-13-00252-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOSHUA DEWIGHT MCCLURE,**                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                    **Appellee.**

---

### On appeal from the 24th District Court
### of Victoria County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Rodriguez, Garza, and Benavides
### Memorandum Opinion by Justice Rodriguez

Appellant Joshua Dewight McClure challenges his conviction by a jury for engaging in organized criminal activity, a second-degree felony, via committing the offense of deadly conduct. *See* TEX. PENAL CODE ANN. § 71.02(a)(1) (West, Westlaw through 2013 3d C.S.); *see also id.* § 22.05 (West, Westlaw through 2013 3d C.S.). By

two issues, appellant argues that: (1) the trial court incorrectly ruled that the jury did not contain disabled members, and (2) the evidence was insufficient to support his conviction. We affirm.

## I.   BACKGROUND

Appellant was indicted on August 5, 2011 in connection with the death of David Davila in the morning hours of July 30, 2011, in Victoria, Texas. The five-count indictment, which accused appellant and six other individuals, included: one count of murder, two counts of engaging in organized criminal activity, and two counts of deadly conduct, namely the discharge of a firearm.

The first count of organized criminal activity was abandoned by the State. Appellant pleaded not guilty to the remaining counts, and his case was tried to a jury. After the close of evidence, appellant was acquitted of murder and one of the deadly conduct charges. The jury found appellant guilty of engaging in organized criminal activity and deadly conduct. For the organized criminal activity conviction, appellant was sentenced to twenty years' confinement and ordered to pay a $10,000 fine and court costs. For the deadly conduct conviction, appellant was sentenced to ten years' confinement. In this appeal, appellant challenges only his organized criminal activity conviction.

## II.   JUROR DISABILITY

By his first issue, appellant argues that the trial court abused its discretion in refusing to remove two persons from the jury when it became apparent that they were disabled.

**A.      Standard of Review and Applicable Law**

Article 36.29(b) of the Texas Code of Criminal Procedure provides:

> After the trial of any felony case begins and a juror dies or, as determined by the judge, becomes disabled from sitting at any time before the charge of the court is read to the jury, the remainder of the jury shall have the power to render the verdict.

TEX. CODE CRIM. PROC. ANN. art. 36.29(b) (West, Westlaw through 2013 3d C.S.). Disabled means "any condition that inhibits the juror from fully and fairly performing the functions of a juror." *Clark v. State*, 500 S.W.2d 107, 108–09 (Tex. Crim. App. 1973). A disabled condition could result from physical illness, mental condition, or emotional state. *See Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999).

We review the trial court's decision to remove or retain jurors under article 36.29 for an abuse of discretion. *Scales v. State*, 380 S.W.3d 780, 784 (Tex. Crim. App. 2012). "The trial court is the sole fact-finder and judge of the credibility of the testifying jurors." *Id.*

**B.      Discussion**[1]

**1.    Juror 1**

After the jury was empaneled but before trial began, Investigator Daniel Villarreal received a call from James Poe, a detective for the Victoria Police Department. Juror 1's daughter works for Poe at the police department. Poe told Villarreal that the juror's daughter believed her mother was in fear of retaliation and was terrified to be on the jury. Poe told Villarreal to notify the trial court.

The trial judge questioned Juror 1 in his chambers. Juror 1 confirmed that her

---

[1] To protect the safety and privacy of the jurors, we will not use their names in this opinion.

3

daughter is a secretary for the Victoria Police Department. She explained that she takes care of her daughter's three children and that they all live with her. Although she is busy with her grandchildren and initially believed she would be excused from jury duty, Juror 1 said that she believed she could be "impartial and open-minded."

Juror 1 admitted that she attempted to get out of jury duty by writing a letter to the district clerk's office explaining that she cared for seven kids and that she was worried that jury duty service would be inconvenient for the mothers who depend on her. Juror 1 noted that she is in the day care business, along with caring for her three grandchildren. However, Juror 1 testified that she could make it work and stay committed as a member of the jury.

Juror 1 denied telling her daughter she was afraid of retaliation by the defendant and said she had no fear. She also stated that it was an honor to be selected as a juror and thought that learning about the justice system would be a beneficial experience.

The day after the trial court questioned Juror 1 in chambers, it called two witnesses to testify regarding this challenge. Poe testified that Adela Lopez, the head clerk in the investigation department, told him that one of his employee's mothers had been picked for the jury in this case. Poe stated that the daughter told him that her mother had been discussing her fear of retaliation with her husband and that she believed her mother was not certain she could convict someone when concerned about the possibility of retaliation. Poe also testified that the daughter stated she believed her father was more concerned about retaliation than her mother.

Juror 1's daughter was the second to testify. She testified that she learned about

4

her mother being selected to serve on the jury when her mother called and asked her to advise her office, the police department, about any possible conflicts. According to the daughter, her mother did not mention any fear of retaliation, but her father was concerned. On cross-examination, Juror 1's daughter was not certain whether her father or mother initially brought up the fear of retaliation. However, she thought her mother was nervous.

Appellant argues that the trial court improperly allowed Juror 1 to remain on the jury because her preoccupation with not being able to watch the children in her care and her fear of retaliation disabled her under article 36.29. We disagree—The trial court acted well within its discretion in allowing Juror 1 to be a part of the jury panel.

First, although Juror 1 originally attempted to be excused from jury duty because of her child care duties, she told the trial court that she was nevertheless eager to engage in the judicial process and to participate as a fair and impartial member. *See Edwards v. State*, 981 S.W.2d 359, 366 (Tex. App.—Texarkana 1998, no pet.) (noting that the juror testified that she would be unable to deliberate and be attentive to the testimony if she could not find someone to care for her son); *see also Freeman v. State*, 838 S.W.2d 772, 774 (Tex. App.—Corpus Christi 1992, pet. ref'd) (disallowing the juror to participate on the panel because he provided sole financial support for his family and did not think he could be attentive during trial). Unlike the jurors from the foregoing cited cases, Juror 1 indicated that she was excited to be on the panel. From the record, we conclude that the trial court could have believed that Juror 1 might have been apprehensive of being on the jury due to her obligations as a caretaker, but came to believe she could be fully committed as a member of the jury. The trial court did not abuse its discretion in refusing

5

to remove Juror 1 on this basis.

Second, with regard to appellant's contention that Juror 1 should be considered disabled due to her alleged fear of retaliation, there was evidence showing that Juror 1 did not have such fear. Juror 1 clearly stated that she did not have any fear. Although there is a conflict between what Juror 1 and her daughter stated about Juror 1's feelings toward being on the jury, considerable deference is given to the trial court because of its ability to evaluate the juror's manner and tone. *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).

### 2. Juror 2

During a recess outside the presence of the jury, appellant called Courtney Yarborough, the deputy district clerk for this trial, to testify. Yarborough testified that she had a conversation with Juror 2 the morning before trial started. In her testimony, Yarborough said that Juror 2 voiced her concerns regarding the jury list; Juror 2 was insecure about her address and place of employment information being on the jury list. Juror 2 was worried about who would have access to this information, seemingly referring to the defense and defendants. Yarborough testified that she told Juror 2 that all parties had access to this information, but none of it would be written down or taken away by anyone.

In response, the State called Patti Hutson to testify. Hutson was the attorney representing co-defendant Erica McClure, appellant's sister. Hutson overheard Yarborough and Juror 2's conversation and testified that she heard concern—not fear— in Juror 2's voice. She also noted that Juror 2 seemed to be expressing a concern

6

shared by other jurors. Hutson testified that, although Juror 2 did not specifically state that the information on the jury list caused her to fear for her safety, Hutson believed that Juror 2's tone and language implied fear.

Appellant argues that Juror 2's concern about the defendant having access to the jury list implied a fear of retaliation, which disabled her as a juror. Again, we disagree.

First and foremost, the trial court was entitled to disbelieve Hutson's interpretation of the conversation and considerable deference is given to the trial court because it is in the best position to evaluate the juror's demeanor and responses. *See Colburn*, 966 S.W.2d at 517. Furthermore, other testimony did not necessarily establish that Juror 2 was legitimately fearful of retaliation. Juror 2 never expressly stated that she feared retaliation. We therefore cannot conclude that the trial court abused its discretion in determining that Juror 2 was not disabled.

## C. Summary

There is sufficient evidence showing that the trial court properly allowed both challenged jurors to participate as members of the panel, and the trial court did not abuse its discretion in refusing to find that those jurors were disabled. *See* TEX. CODE CRIM. PROC. ANN. art. 36.29(b); *Scales*, 380 S.W.3d at 784. Appellant's first issue is overruled.

### III. SUFFICIENCY OF THE EVIDENCE

By his second issue, appellant argues that the evidence was insufficient to support his conviction for engaging in organized criminal activity.

## A. Standard of Review and Applicable Law

"The standard for determining whether the evidence is legally sufficient to support

7

a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.). "The jury is the exclusive judge of the credibility of the witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile the conflicts in the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000) (en banc) (citing *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996)).

Juries are permitted to make reasonable inferences from evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007). "Circumstantial evidence alone may be used to prove that a person is a party to an offense." *Powell v. State*, 194 S.W.3d 503, 506 (Tex. Crim. App. 2006).

We measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

Appellant committed the offense of engaging in organized criminal activity if he

acted "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang commit[ed] or conspire[ed]" to commit the crime of deadly conduct. *See* TEX. PENAL CODE ANN. § 71.02(a)(1). In addition, the Texas Court of Criminal Appeals has held that the members of the combination must "intend to work together in a continuing course of criminal activities" and that each act of conduct committed in furtherance of the criminal purpose need not necessarily be a criminal offense. *See Nguyen v. State*, 1 S.W.3d 694, 697 (Tex. Crim. App. 1999).

**B.    Discussion**

**1.    The Evidence**

Alfredo Lara was the first to testify. Lara lived at 806 Ash Street. Daniel Davila, the victim of the shooting, was Lara's neighbor. Lara testified that on the night of the incident, a car stopped quickly, parking halfway onto his driveway and halfway onto his neighbor's yard. Lara noticed two women inside the car. The driver stepped out of the car and yelled at Lara and his roommate. The passenger in the car did not get out, but was yelling as well. Lara identified the passenger as Erica. Lara testified that both women stated that they had loaded weapons and demanded to know where appellant was located.

The State then called Officer Ryan Sells of the Victoria Police Department to testify. Officer Sells testified that he was called to Ash Street regarding a disturbance on the night of July 29, 2011. When he arrived, approximately a hundred people were scattering, either running or driving, in different directions. Officer Sells was directed

9

toward a fight. Upon arriving, he noticed people yelling and assumed a disturbance had occurred. He ordered the individuals to disperse and left the area. Later that night, he was again called to the area in regard to a bullet hole found on the outside of a home.

Detective Jeffrey Lehnert also testified for the State. He was the investigator on-call the weekend of the incident. He testified that there were four cars involved in the shooting. During Detective Lehnert's testimony, an exhibit containing the vehicle information and owners of the four vehicles was introduced into evidence. Detective Lehnert testified that he interviewed Matthew Balboa, who identified appellant in a photo array. Detective Lehnert also interviewed appellant and Erica together. He testified that during the interview, appellant stated that he had been hit in the head with a beer bottle during an altercation involving multiple smaller fights. Detective Lehnert described how appellant and Erica attempted to whisper and silently communicate with each other during the interview by text messaging or passing notes. After the police department obtained a search warrant and seized the cell phones used by appellant and Erica, some messages were found and others had been deleted. Detective Lehnert testified that when appellant notified Erica that his phone had been taken, Erica removed the SIM card from her phone. Appellant and Erica fled from Victoria County immediately after the interview.

Kia Johnson, a co-defendant, also testified for the State. Johnson identified appellant and Erica as participants. According to Johnson, she and Erica were traveling to Houston when Erica received a phone call about appellant being assaulted at a party. Johnson testified that Erica wanted to return to Victoria to check on appellant and asked

10

whether Johnson had a gun. Johnson overheard Erica ask Dalton Taylor for guns. Taylor, along with Marcellus Brown, arrived at Johnson's house with two guns. Appellant, Jeff Hill, Tyere Lewis, and others arrived at her home in multiple vehicles shortly thereafter.

Johnson testified that weapons were exchanged in her kitchen. Taylor and Brown placed a microwave on her kitchen table, which was used to "cook" crack cocaine. According to Johnson, the group was irate and wanted to deal with the "Hispanics."

Johnson then testified that the group piled into the four different vehicles and left. When they arrived at the scene, appellant was carrying a long gun, and Johnson saw appellant fire a shot as the "Hispanics" ran out of the house. Hill fired shots from a .22 caliber revolver in the victim's direction. Once the group returned to Johnson's home, Erica began to plan what they would say to police if they were questioned. Johnson noted that the guns were gone once appellant and the rest of the "posse" left.

Johnson further testified that Erica called her later to let her know that she and appellant were fleeing Victoria. On cross-examination, Johnson stated that Taylor was a member of a gang called Rollin 60s, but that she did not believe Brown was a member.

Next, the State called Detective Poe to testify. He participated in the interview of appellant and Erica. The trial court admitted text messages of a conversation between appellant and Erica into evidence. In the conversation, appellant told Erica that he was going to tell the truth. Erica warned him that they would both go to prison if he did. Later, video evidence from the interview was admitted into evidence showing Erica whispering to appellant, asking whether or not he washed his hands, saying she deleted

11

the contents of his phone, and telling him she had disposed of his clothes.

The State also called Paul Martinez, who lived close to the victim's house, to testify. Martinez testified that a group of African-Americans gathered around his house on the night of the incident. He witnessed appellant fire a shotgun.

The State then called Jeffrey Hill, a co-defendant. Hill testified that he, Lewis, and appellant went to a party in the Pine Street area. According to Hill, appellant started a fight by hitting another man in the face. Hill described the man as Hispanic, skinny, and smaller than himself. Appellant was knocked to the ground when he was clubbed in the face with a beer bottle. People at the party proceeded to hit appellant while he was on the ground.

After the altercation, they went to a convenience store to clean the blood from appellant's face. Appellant made a couple of phone calls; one was to Erica and the other to Brown. Appellant told them that he was jumped and that he wanted to go back to the party. Appellant asked Brown if he had any guns. Hill testified that appellant spoke to others about getting payback while at Johnson's apartment and that appellant and Brown expressly discussed shooting at the people who attacked appellant, rather than just shooting in the air.

After returning to the party, Brown fired the first shots, then Hill fired shots from a revolver, and appellant fired shots from a shotgun. Although Hill testified that he was not the person shooting at the man who fell down, he did see the man fall. After the shooting, the group went back to Johnson's apartment.

The State asked Hill to review pictures of his Facebook account. One of the

12

pictures contained Hill, Lewis, and appellant; the three referred to themselves as "3 Deep." Each page that Hill reviewed contained appellant, Hill, Lewis, and Kierra Brown, appellant's girlfriend. Hill mentioned the shooting in one of the pictures.

The trial court then admitted State's Exhibit 145 into evidence. This exhibit included a post on Hill's Facebook account stating "fer=devil=us 3 Deep 4 life." Hill testified that the post was intended as a warning to the people who were at the party. On cross-examination, the defense brought up a Facebook post by Hill on the evening before the party stating "we meet evil." Hill testified that he posts this frequently on his Facebook account.

Next, the State called Brian Vassar to testify. At the time of the incident, Vassar lived with Martinez, who testified earlier at trial. Vassar testified that he was awoken by several gunshots in the early morning of July 30 and that he witnessed the gunmen fire shots. Vassar also testified that he saw a female driving down the road, saying "get in the car." Vassar identified appellant as one of the men who was present during the shooting.

The State also called Jacklyn Connor to testify. Connor, who was in jail at the time of trial, had previously lived with Erica. Connor testified that a day after the shooting, Erica was packing her belongings. She overheard a conversation between Erica and her cousin in which Erica said "they got the motherfuckers." Connor testified that appellant and Erica were going to blame the shooting on Brown and that they were going to flee Victoria.

Finally, the State called Pedro Lucio to testify. Lucio testified that Brown, Hill, and

13

appellant were housed next to him at the Victoria County Jail and that he overheard Brown say that he had removed fingerprints from the shell casings of the bullets.

## 2. Analysis

Appellant argues that the evidence was insufficient to show that he acted with intent to work in a continuing course of criminal conduct. We disagree—the evidence shows that appellant, along with the other members of the group, continued their criminal activity after the shooting. In *Dowdle v. State*, the co-conspirators fled the scene, met up after to figure out a plan, and went to another county to hide the stolen property. 11 S.W.3d 233, 236 (Tex. Crim. App. 2000) (finding that appellant's participation in the crime was not concluded after the shooting). The court in *Dowdle* considered the post-shooting activity to be indicative of a "continuing course of criminal activity." *Id*. In our case, after the shooting, appellant retreated in one of the vehicles with the entire group. Erica proposed false responses to give police if they were questioned. The evidence shows that Johnson was unaware of the guns' location when they arrived at the house, from which the jury could have inferred that the guns were hidden by the group. And appellant and Erica planned to flee Victoria to avoid getting arrested.

Moreover, there was evidence that, before the shooting occurred, the group was involved in other criminal activity. According to Johnson's testimony, when the guns were being dispersed at her home before the retaliation, Brown and Taylor, who were both directly involved in the shooting, were cooking crack cocaine in Johnson's microwave.

Additionally, Hill posted "fer=devil=us 3 Deep 4 life" on his Facebook account,

14

which implied an intent to invoke fear into their enemies. *See Mast v. State*, 8 S.W.3d 366, 369 (Tex. App.—El Paso 1999, no writ) ("An agreement may be inferred from the acts of the parties.").

Finally, evidence shows that the group intended to conceal incriminating evidence. Erica planned an escape and conspired to give false information to authorities, and Brown told Hill and appellant that he had removed fingerprints from the bullet shell casings.

In conclusion, there is ample evidence that appellant had the requisite intent to maintain ongoing criminal activities with the group involved in the shooting. *See* TEX. PENAL CODE ANN. § 71.02(a)(1); *Nguyen*, 1 S.W.3d at 697. Therefore, reviewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was legally sufficient; a rational jury could have concluded, beyond a reasonable doubt, that appellant was guilty of engaging in organized criminal activity. *See* TEX. PENAL CODE ANN. § 71.02(a)(1); *Jackson*, 443 U.S. at 319; *Johnson*, 364 S.W.3d at 293–94. Appellant's second issue is overruled.

## IV. CONCLUSION

We affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
7th day of August, 2014.

15